_____
Honorable Gary Spraker
United States Bankruptcy Judge

Entered on Docket
February 12, 2024

Aviva Y. Gordon, Esq. (NV Bar No. 5333)
GORDON LAW, LLC
1820 E. Warm Springs Road #115
Las Vegas, NV 89119
Telephone: (702) 527-5557
agordon@gordonlawlv.com

Thomas H. Fell, Esq. (NV Bar No. 3717)
Anthony W. Austin, Esq. (NV Bar No. 10850)
FENNEMORE CRAIG, P.C.
9275 W. Russell Road, Suite 240
Las Vegas, NV 89148
Telephone: (702) 692-8000
tfell@fennemorelaw.com
aaustin@fennemorelaw.com

*Attorneys for Silverstone Ranch Community Association*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>Stoneridge Parkway, LLC,<br><br>          Debtor. | Case No.: 22-10540-gs<br>Chapter 11 |
| Stoneridge Parkway, LLC, a California Limited Liability Company,<br><br>          Plaintiff,<br><br>    v.<br><br>Silverstone Ranch Community Association, a Nevada Non-Profit Corporation,<br><br>          Defendant. | **JUDGMENT CONFIRMING**<br>**ARBITRATION AWARD**<br><br>Adversary Proceeding: 22-01050-gs<br><br>Hearing Date:  February 1, 2024<br>Hearing Time:  9:30 a.m. |

30917120.1/058341.0001

The Court having conducted a hearing on Silverstone Ranch Community Association's Motion To Confirm Arbitration Award as a Judgment on February 1, 2024; the Court having reviewed the Motion, the Limited Response; and the Reply Points and Authorities along with argument of counsel; and this Court having jurisdiction over this matter pursuant to 9 USC § 9 and Rule R-49 of the AAA Commercial Rules to enter judgment confirming the Arbitration Award; and this Court having found notice of the Motion was appropriate under the circumstances and no other notice need be provided; and with good cause appearing:

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:

The Final Arbitration Award dated December 1, 2023, attached hereto and incorporated herein by this reference is confirmed in its entirety.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that:

This Court retains jurisdiction to enforce this Judgment.

Submitted by:

FENNEMORE CRAIG, P.C.

By:   */s/ Thomas H. Fell*
    Thomas H. Fell, Esq. (No. 3717)
    Anthony W. Austin, Esq. (No. 10850)
    9275 W. Russell Road, Suite 240
    Las Vegas, NV 89148
    - and -
    Aviva Y. Gordon, Esq. (No. 5333)
    GORDON LAW, LLC
    1820 E. Warm Springs Road #115
    Las Vegas, NV 89119
    *Attorneys for Silverstone Ranch Community Association*

Approved by:

SCHWARTZ LAW, PLLC

By:   */s/ Samuel A. Schwartz*
    Samuel A. Schwartz, Esq. (No. 10985)
    Jason Thomas, Esq. (No. 16148)
    601 East Bridger Avenue
    Las Vegas, NV 89101
    *Attorneys for Stoneridge Parkway, LLC*

2

30917120.1/058341.0001

**JAMS ARBITRATION CASE REFERENCE NO. 5260000004**

**Silverstone Ranch Community Association,**
    **Claimant,**

                **and**

**Stoneridge Parkway LLC,**

                **and**

**Shun Lee Lending Company, Ltd.,**
    **Respondents, Counterclaimants.**

---

**FINAL AWARD**

### I.      INTRODUCTION

**A.      Parties and Counsel.**  The parties to this arbitration are identified in the caption and are represented as follows:

Aviva Y. Gordon, Esq.
Gordon Law
2850 W. Horizon Ridge Pkwy
Suite 200
Henderson, NV   89052
Tel: 702-527-5557
Counsel for Claimant

Samuel A. Schwartz, Esq.
Gabrielle A. Hamm, Esq.
Bryan Lindsey, Esq.
Schwartz Law, PLLC
601 East Bridger Avenue
Las Vegas, NV   89101
Tel: 702.802.2207
Counsel for Respondent

Robert M. Hirsch, Esq.
Rasmeet K. Cahil, Esq.
Michael A. Kaplan, Esq.
Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Tel: 973) 597-2500
Attorneys for Shun Lee Lending, Ltd.

### B.      Arbitrators.

    Hon. Carl (Bill) W. Hoffman, Jr. (Ret.)
    Hon. Philip M. Pro (Ret.)
    Hon. David T. Wall (Ret.)

1

7160 Rafael Rivera Way Suite #400
Las Vegas, NV 89113
702-835-7806   702-437-5267(fax)

3. <u>Case Manager</u>:
Scott Parreno
7160 Rafael Rivera Way Suite #400
Las Vegas, NV 89113
702-835-7806   702-437-5267(fax)

## II.   ARBITRATION PROCEEDINGS

In Las Vegas, Nevada, on July 18-19, 2023, this matter came to arbitration in accordance with an order compelling arbitration by a Nevada District Court pursuant to an arbitration clause contained in Article 10 of the Second Amended and Restated Reciprocal Easement Agreement and Covenant to Share Costs, recorded June 14, 2002 in Clark County, Nevada.  The Agreement at Article 10.3.2 provides that the award rendered by the three-arbitrator panel shall be final and binding.

The relevant contract between the parties contained a Covenant which required Stoneridge to operate a golf course.  In its Second Amended Arbitration Demand, Silverstone Home Owners Association ("HOA") has three claims against Stoneridge:  Declaratory Relief that the Covenant was valid, Breach of Contract, Breach of the Implied Duty of Good Faith and Fair Dealing, and a claim against Shun Lee for Declaratory Relief regarding the enforceability of the Covenant.

In its First Amended Demand and Counterclaim against Silverstone, Stoneridge has several claims, including for Amendment of Silverstone's Declaration pursuant to NRS 116.21175, to Remove the Restrictive Covenant, for Declaratory Relief as to the enforcement of the Covenant, for Attorney's Fees and Costs for compelling arbitration, to Remove the Covenant pursuant to the doctrine of Impossibility, and for Declaratory Relief as to the Covenant under the Force Majeure Clause.

Prior to the evidentiary hearing, the parties submitted briefs regarding motions for summary judgment.  The Panel conducted a hearing on the Motions for Summary Judgment on May 25, 2023, attended by all parties.  The "Order on Summary Judgment" dated May 26, 2023, is hereby incorporated by reference, and determined final for purposes of this award.  Of note, Stoneridge's Claim for Attorney's Fees and Costs resulting from having to remove the matter to arbitration when it was first filed in court was granted, to be finally resolved at the conclusion of the case.  Additionally, Silverstone's Breach of Implied Covenant of Good Faith and Fair Dealing was dismissed.

The evidentiary hearing was conducted in person, and each side offered documentary evidence at the hearing which was admitted.  A court reporter recorded the arbitration, and the record was provided on August 4, 2023.  Witness Daniel Modaberpour, Doa Ross, and Expert

2

Witnesses Dr. Brent Haddad and Mr. George Garcia were called as witnesses and cross-examined. At the conclusion of the hearing, the parties agreed to submit post-hearing briefs which were provided on August 18, 2023. The case was then submitted for decision. The undersigned arbitrators, having examined the submissions, proof and allegations of the parties, find, conclude, and issue this Final Award, [1] as follows.

### III.    FACTS AND PROCEDURAL HISTORY

1. On or about June 14, 2002, the Golf Course Agreement ("Agreement")was recorded against the Silverstone Ranch Community Golf Course located at 8600 Cupp Drive, Las Vegas, Nevada 89131, now owned by Stoneridge (hereinafter referred to as the "Golf Course").

2. The Golf Course Agreement was duly recorded against the Golf Course Property in 2002 and is a fully integrated and unambiguous contract that contains the following relevant provisions:

3.1  Golf Course Use.  The Golf Course Owner hereby covenants and agrees that the Golf Course Property shall be operated and maintained solely as a 27-hole (or more), championship golf course and related improvements. The Golf Course Owner further acknowledges and agrees that Residential Property Owner has acquired and will develop the Residential Property in reliance upon Golf Course Owner's covenants in this Section 3.1.  Subject to Sections 13.2 and 13.3 below, the restrictions set forth in this Section 3.1 shall continue in perpetuity.

9.1  Force Majeure.  Except as otherwise expressly provided in this Agreement to the contrary, each party shall be excused to perform any covenant or obligation of this Agreement, except an obligation to pay any sums of money not expressly conditioned on any party's performance of a covenant or obligation that has itself been excused by this Section, in the event but only so long as the performance of any such covenant or obligation is prevented, delayed, retarded or hindered by any of the following:  act of God, fire, earthquake, floods, explosion, action of the elements, war, invasion, insurrection, riot, mob, violence, sabotage, inability to procure or general shortage of labor, equipment, facilities, materials or supplies in the open market, failure of transportation, strikes, lockouts, action of labor unions, condemnation, requisition, laws, orders of governmental or civil or military authorities, or any other cause, whether similar or dissimilar to the foregoing, not within the respective control of such party (other than the lack or inability to procure funds to fulfill its covenants and obligations provided in this Agreement).  Notwithstanding any specific references in certain provisions of this Agreement to this Section, the absence of such specific reference in any other provision shall not be deemed to diminish the general applicability of this Section.

9.2  Notice.  In the event either party claims excuse from its duty to perform any covenant or obligation set forth in this Agreement due to any of the events of force majeure set forth in Section 9.1, such party shall notify the other party of the occurrence

---

[1] The Panel issued its Interim Final Order on September 19, 2023.

of such event of force majeure within twenty (20) days following the occurrence thereof….

13.2.1  This Agreement shall continue in full force and effect until terminated in accordance with the provisions of Section 13.2.2.

13.2.2  This Agreement may be terminated at any time only if such termination is approved by Golf Course Owner, Residential Property Owner (if Residential Property Owner then owns any Unit or any other portion of the Residential Property) and the affirmative vote or written consent, or any combination thereof, of seventy five percent (75%) of the Unit Owners…

13.3.1 This Agreement may be amended only with the written approval or the affirmative vote, or any combination thereof, of (i) the Unit Owners (including, without limitation, Residential Property Owner) owning not less than seventy-five percent (75%) of the Units within the Residential Property which have been annexed pursuant to the terms of the Declaration (ii) Residential Owner (for so long as the Residential Owner owns any portion of the Residential Property, and thereafter the Association), and (iii) the Golf Course Owner.

3. From the time that the Golf Course was operational after development until September 2015, the Golf Course was used as a golf course.

4. On December 16, 2015, the Golf Course was acquired by Stoneridge from the prior owner, Desert Lifestyles, LLC.

5. Silverstone and Stoneridge agree they are subject to the terms of the Golf Course Agreement.

6. The Golf Course Agreement places numerous affirmative requirements on Stoneridge concerning the maintenance of the Golf Course in order for it to meet the standards of a "typical first-class, 27-hole, championship golf course."  Natural grass is required on the greens, tees, and fairways.

7. The Golf Course was fully operational on September 1, 2015 when Desert Lifestyles, LLC (Stoneridge's predecessor in interest) took possession of it.

8.  Upon taking possession, Desert Lifestyles closed the Golf Course and turned off the water and irrigation to the Golf Course, resulting in the lawsuit entitled *Hellerstein v. Desert Lifestyles, LLC*, 2015 WL 6962862 (D. Nev. Nov. 10, 2015).

9.  In *Hellerstein*, the court issued a preliminary injunction in relation to the Golf Course on November 10, 2015.  The following relevant findings of fact were made:

a. The Golf Course was fully operational on September 1, 2015, when Desert Lifestyles, LLC (Stoneridge's predecessor in interest) took possession of it.

4

b. Upon taking possession, Desert Lifestyles closed the Golf Course and, in bad faith, turned off the water and irrigation to the Golf Course.

 c. Desert Lifestyles thereafter made bad faith representations to the Court that the Golf Course was nonoperational.

d. Desert Lifestyles knew of the obligations under the Golf Course Agreement. Nonetheless, it intentionally violated those obligations.

e. Desert Lifestyles did not have the financial resources to operate the Golf Course.

10.   The court ordered that Desert Lifestyles, "and all other persons in active participation with them who receive actual notice of this Order, shall restore the Silverstone Golf Course...and shall thereafter maintain the Golf Course." The restoration was mandated to occur by December 1, 2015.

11.   On or about December 11, 2015, Stoneridge acquired the Golf Course from Desert Lifestyles.  Stoneridge assumed the existing liability secured by a Deed of Trust in favor of Aevitas Capital, LLC.   On the following day, Stoneridge executed a Deed in Lieu of Foreclosure for the benefit of Aevitas Capital.

12.   The day after entering into the Purchase Agreement, on or about December 12, 2015, Desert Lifestyles executed a Grant, Bargain and Sale Deed which was recorded on or about December 15, 2015.

13.   On or about December 12, 2015, the day after entering into the Purchase Agreement, and the same day that Desert Lifestyles executed the Grant, Bargain and Sale Deed, Stoneridge executed a Deed in Lieu of Foreclosure for the benefit of Aevitas Capital.

14.   Shun Lee Lending, Ltd. is a successor to Aevitas Capital.

15.   At the time Stoneridge acquired the Golf Course, it did not have financial resources or a bank account.

16.   Mr. Modaberpour is the Manager of Stoneridge LLC.  He had no experience in golf course operations.  He testified that he learned of the availability of the golf course around the beginning of December 2015, and that he believed he needed to "close the deal" to purchase the golf course within two weeks.  He knew that the golf course was closed and was not making money.

17.   Mr. Modaberpour based his decisions on his discussions with Mr. Matthew Abassi, a California attorney who represented both Desert Lifestyles, the seller, and Stoneridge, the buyer.[2]

---

[2]  Lacking sufficient information, the Panel takes no position on the propriety of the lawyer representing both sides of the transaction.

5

Mr. Modaberpour was aware of the *Hellerstein* litigation as well as the Golf Course Agreement.

18. Mr. Modaberpour believed that a suitable golf course could be restored using only about 200 of the 270 acres of the Property, and intended to sell about 70 acres for residential construction and generate sufficient money to pay for the golf course restoration if the HOA was willing to subsidize the course.

19. On December 14, 2015, Mr. Modaberpour began to contact golf consultants to help him to redevelop the golf course and obtain HOA agreement, as well as to golf course operators to operate the course.

20. Until about May 2016, the critical areas of the golf course were watered, and maintenance was performed by Stoneridge's contractor Western Golf, but they were not sufficient to operate a golf course. Minimal security services were established, and some fencing was erected to protect some buildings.

21. After acquiring the golf course, Mr. Modaberpour investigated the possibility of getting reclaimed water rates for the golf course, but because there was no infrastructure for reclaimed water, it was prohibitively expensive, and he took no further action in that regard.

22. After acquiring the golf course, Mr. Modaberpour negotiated with the Silverstone HOA Board of Directors to try to come to some resolution regarding the golf club, but the discussions were not successful.

23. Since Stoneridge acquired the Golf Course, the City of Las Vegas has found code violations resulting from Stoneridge's neglect of the Golf Course Property, resulting in assessments of $1,368,000 against Stoneridge.

24. Stoneridge has never paid property taxes in the time that it has owned the Golf Course Property.

25. Shun Lee received an assignment of the Deed of Trust recorded against the Golf Course in September, 2018.

26. On March 22, 2021, the Las Vegas Valley Water District ("LVVWD") notified Stoneridge that there was ongoing recorded usage on the meters on the Golf Course Property despite the fact that Stoneridge had not paid any amounts to the LVVWD since October 31, 2016.

27. Notwithstanding the foregoing, the LVVWD offered to reduce the outstanding amounts due from Stoneridge from $1,012,238.11 to $60,418.31. In connection with that offer, the LVVWD agreed to defer further obligation to pay a required deposit. Despite the LVVWD's offer on March 22, 2021, which was reiterated on June 15, 2021, Stoneridge did not pay the LVVWD.

28. On or about November 2, 2021, the LVVWD created a new service rule that affected

6

golf courses without services or water commitments. Rule 3.10(h) provides: The District will not serve and customers shall not use district water for golf courses not receiving service from the District or possessing a water commitment from the District as of November 2, 2021. (Hereinafter, the "Regulation").

29. No other water district in the United States has entered a rule similar to the Regulation.

30. Stoneridge's failure to pay the LVVWD caused it to decide not to approve water for golf course use. When Stoneridge stopped operating as a golf course, the approved use of water ended.

31. At any time prior to November of 2021, if Stoneridge would have paid its water bill, regardless of the condition of the Golf Course Property, Stoneridge could have restored the Golf Course Property, had water available, and would not have been subject to the Regulation.

32. The Golf Course Property is the only privately owned golf course property affected by the November 2, 2021, rule change.

33. On May 19, 2022, Stoneridge served on the HOA a Notice of Force Majeure Event pursuant to Article 9.1 of the Agreement indicating that water will not be provided to the golf course.

34. The Golf Course Agreement is enforceable, and its provisions are unambiguous. Stoneridge has not complied with the obligation to maintain the golf course, and it has neither watered nor maintained the Golf Course Property since May 13, 2016.

35. Since 2000, Southern Nevada has experienced a severe drought which has reduced the allocations for water use for golf courses. The drought will continue for the foreseeable future.

36. Water for Stoneridge golf course was turned off because it failed to pay its bills.

37. To the extent that the November 2, 2021, rule change affects the Golf Course Property, it affects it because Stoneridge failed to pay amounts due and owing to the Las Vegas Valley Water District.

38. Shun Lee is bound by all aspects of the Golf Course Agreement, **if it forecloses on the Golf Course Property.**[3]

---

[3] The Interim Final Order was issued on September 19, 2023, and did not contain the bold language. Shun Lee requested by letter on October 17, 2023 that the Order be modified to correct errors by adding the phrase, "if it forecloses on the property." Silverstone objected to the modification on October 10, 2023, arguing that the AAA rules which govern these proceedings do not allow such a modification except for clerical, typographical or computational errors in the award, and this modification would be substantive. Stoneridge did not object to the

7

## IV.    ANALYSIS

**1.  Is the Agreement a valid contract as to all parties?**  The parties agree that the Agreement is enforceable and unambiguous.  Stoneridge does not dispute that the Agreement was breached by the owner of the golf course prior to Stoneridge obtaining title, or that there has not been compliance with the obligations in the Agreement to maintain a golf course.  Shun Lee agrees that it is bound by the Golf Course Agreement if it forecloses on the property.

For Silverstone's claims to be successful, Stoneridge's affirmative defenses and claims must be resolved in Silverstone's favor.  Stoneridge argues that it is excused from performance of the Agreement under the force majeure provisions of the Agreement, and because it is impossible.

### 2.  Force Majeure and Impossibility.

Silverstone argues that as a matter of law, impossibility and frustration of purpose are inapplicable because the contract contains a force majeure clause which supersedes the common law doctrine of impossibility and frustration of purpose.  Stoneridge responds that the force majeure clause is broader than the doctrine of impossibility, but it nevertheless applies.

### a.  Impossibility and Force Majeure are not Mutually Exclusive.

In Nevada, force majeure clauses excusing performance are enforceable even when, as here, they provide broader relief than the common law defense of impossibility.  *Nebaco, Inc. v Riverview Realty Co.,* 87 Nev. 55 (1971).  If the unforeseen contingency is provided for in the contract, its occurrence provides an excuse for nonperformance.  *Id.*, at 56.  Nevada will enforce contractual provisions excusing performance that are broader than the common law defense of impossibility so long as the contingency is provided in the contract.  *Baroi v Platinum Condo.. Dev., LLC,* 874 F. Supp. 2d 980, 985 (D. Nev. 2012).  Accordingly, the defenses of impossibility and force majeure are not mutually exclusive, and both may be considered.

### b.  Force Majeure

Stoneridge concedes that the drought did not prevent the operation of the golf course. Stoneridge argues that the Agreement should be terminated pursuant to the Agreement's Force Majeure Clause, specifically, because the LVVWD Regulation (a governmental order) made it impossible to obtain water for a new golf course.

---

modification.  Shun Lee responded on October 17, 2023, arguing that the omission of the phrase was a clerical or typographical error.  The Panel agrees, noting that in its analysis in Section IV, paragraph 1, it determined that Shun Lee agrees that it is bound by the Golf Course Agreement if it forecloses on the property. There is no evidence to support the finding that Shun Lee would be bound by the Agreement in the absence of foreclosure. Accordingly, Shun Lee's request to modify the Interim Final Order is granted.

The relevant force majeure clause provides:

9.1 Force Majeure.  Except as otherwise expressly provided in this Agreement to the contrary, each party shall be excused to perform any covenant or obligation of this Agreement, except an obligation to pay any sums of money not expressly conditioned on any party's performance of a covenant or obligation that has itself been excused by this Section, in the event but only so long as the performance of any such covenant or obligation is prevented, delayed, retarded or hindered by any of the following:  … **orders of governmental … authorities,** or any other cause, whether similar or dissimilar to the foregoing, **not within the respective control of such party** (other than the lack or inability to procure funds to fulfill its covenants and obligations provided in this Agreement).  *(Emphasis added)*.

Although there are no Nevada Supreme court cases which have discussed it, the parties generally agree that force majeure relieves a party from its contractual duties and obligations when its performance of those duties and obligations has been prevented by a force beyond its control.  California courts, whom Nevada often regards as persuasive, have used a standard legal dictionary definition of a force majeure clause as a "contractual provision allocating the risk of loss if performance becomes impossible or impracticable, especially as a result of an event or effect that the parties could not have anticipated or controlled." *Nat. Res. Def. Council v. Norton*, 236 F. Supp. 3d 1198, 1220 n.9 (E.D. Cal. 2017) (quoting Black's Law Dictionary 718 (9th ed. 2009)).  A force majeure clause is equivalent to an affirmative defense. 30 Williston on Contracts § 77.31, at 364 (4th ed. 2004). The types of events which constitute force majeure depend on the specific language included in the clause itself. *Id.*  A party relying on a force majeure clause to excuse performance bears the burden of proving that the event was beyond its control and without its fault or negligence. *Id.* at 365.  The defense of force majeure is subject to equitable principles.

The parties here defined the contours of force majeure in their agreement to dictate the application, effect, and scope of force majeure.  The parties contemplated governmental action might occur in the Force Majeure clause and agreed to include the requirement that such an occurrence not be within the respective control of the party.  Here, the application of the Force Majeure does not excuse Stoneridge for non-performance.  The Regulation applied to Stoneridge because of Stoneridge's inaction paying its water bill and maintaining the golf course.

Operating the golf course was not beyond the ability or control of Stoneridge.  The Golf Course was operational a few months before Stoneridge acquired it.  Nearly from the beginning of its acquisition, Stoneridge was in material breach of the Golf Course Agreement.  Stoneridge acquired the property subject to the court ordered obligations set forth in *Hellerstein* to maintain the golf course, but ignored those obligations.  Stoneridge never had the resources to fulfill that obligation, and Mr. Modaberpour's due diligence to determine what was needed to operate the golf course was negligible.  Upon acquiring the property, Mr. Modaberpour's available resources were limited to his plan to go out and find a partner to invest in the golf course, and he did little to nothing to maintain the course and property.  Ms. Ross testified that Stoneridge could have reopened the golf course any time prior to November 2, 2021.  The Regulation was the result of

9

the ongoing drought in Southern Nevada, but it applied specifically to Stoneridge, and to no other private golf course, because it failed to pay its water bill, thereby allowing the course to deteriorate.

Stoneridge had a reasonable opportunity to maintain the golf course by paying its water bill. On March 22, 2021, LVVWD notified Stoneridge that there was ongoing recorded usage on the meters on the Golf Course even though it had not paid any amounts to the LVVWD since October 31, 2016. LVVWD offered to reduce the outstanding amounts due from Stoneridge from $1 million to $60,418 to restore water service. Ms. Ross testified that if Stoneridge had paid its bills, it might have been grandfathered in and not considered to be a new golf course and not had been subject to the Regulation. But Stoneridge did not pay the bill.

With the passage of the Regulation, water service was not available because Stoneridge decided not to pay for water to maintain the course, not because of the drought. Because the decision to maintain the course was within the control of Stoneridge, it could have avoided the consequences of the Regulation – the force majeure. Stoneridge did not act in good faith in maintaining the golf course and was in breach of contract when the Regulation came into effect. Accordingly, the force majeure clause is not available to Stoneridge to excuse its performance of the contract.

### c. **Impossibility and impractibility**.

Stoneridge argues that its performance to operate the Golf Course is excused pursuant to the doctrine of impossibility and the related doctrine of changed circumstances.

In Nevada, the doctrine of impossibility applies where "performance is made impossible or highly impractical by the occurrence of unforeseen contingencies, but if the unforeseen contingency is one which the promisor should have foreseen, and for which he should have provided, this defense is unavailable to him." *Nebaco, Inc. v Riverview Realty Co., Inc.,* 87 Nev. 55, 57 (1971). The Restatement (Second) of Contracts section 261 explains that "(I)n order for a supervening event to discharge a duty, the non-occurrence of that event must have been a basic assumption on which both parties made the contract." *Cashman Equip. Co. v. W. Edna Assocs., Ltd.*, 132 Nev. 689, 702 (2016). The ultimate inquiry for purposes of the impossibility defense is whether the intervening changes of circumstance were so unforeseeable that the risk of increased difficulty or expense should not properly be borne by the promisor. 18 *Williston, supra,* § 1963, at 180; 6 *Corbin, supra,* § 1322, at 330.

Stoneridge argues that the determination of foreseeability is based upon how unexpected at the time of contracting was the event which prevented performance, and in 2002, or in 2015, it was not foreseeable that the Regulation would be passed. But courts have "uniformly refused to find impossibility where the difficulty has been caused by the promisor, or where the difficulty was preventable by the promisor." *Taylor-Edwards Warehouse & Transfer Co., of Spokane v. Burlington N. Inc.*, 715 F 2d 1330, 1336 (9th Cir. 1983). In *Taylor*, the court refused to apply the defense of impossibility when the promisor decided to abandon a main rail line that was necessary to accomplish the contract. *See also, Nissho-Iwai Co. v. Occidental Crude Sales*, 729 F.2d 1530, 1540-41 (5th Cir. 1984) (applying California law and noting that "the California

Supreme Court has read into contractual force majeure provisions both aspects of "reasonable control" and good faith in not causing the excusing event and diligence in taking reasonable steps to ensure performance.")

Stoneridge's impossibility defense relies upon a finding that it was unforeseeable at the time of contracting that the Regulation would be passed which would prevent water from being provided to new golf courses, and that Stoneridge would be considered a "new" golf course. Although Stoneridge could not have anticipated that the Regulation would be created, its application to Stoneridge was within its control. This change of circumstances was not so unforeseeable that the risk of increased difficulty should be borne by Silverstone rather than Stoneridge. Had Stoneridge attempted to maintain the course, and paid for water, the course would not have deteriorated to the point of being considered a "new course" under the purview of the Regulation. Stoneridge's failure to maintain the golf course was the primary cause of the applicability of the Regulation which made the maintenance of the golf course impossible. Stoneridge should not be allowed to breach its contract and then argue that its performance was impossible by a later intervening act. *See* Joseph M. Perillo, Contracts, Section 13.12 at 490 (7th ed. 2014) Restatement (First) of Contracts section 457 (1932) ("impossibility on the part of the promisor occurring after he has committed a breach does not ordinarily discharge him…") *See also*, *Gen Linen Servs, Inc., v. Smirnioudis*, 153 N.H. 441, 443-44 897 A.2d 963, 966 (2006) (For the doctrine of commercial frustration to apply, the supervening event must occur before the party seeking its protection otherwise breaches the contract.")

Similarly, Stoneridge may not benefit from the doctrine of impractibility because Stoneridge is guilty of contributing to the impractibility. *See* Perillo, Contracts, Section 13.2 at 472 (7th ed. 2014) ("supervening prohibition of performance by law or administrative regulation provides an excuse for non-performance," but "if the law intervenes because of the promisors' fault, the defense is denied.")

Finally, as a practical matter, Stoneridge did not ever have the financial ability to maintain the course. It had not paid its water bill, its property taxes, or the fines in excess of $1 million that had been levied against it by the City of Las Vegas. It had no intention of operating the golf course as required by the Agreement, but instead hoped to negotiate a modification to the agreement with the cooperation of the HOA, which failed. Regardless of the Regulation, Stoneridge could not maintain or operate the golf course. "A contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove." *Gulf, Mobile Ohio R.R. Co. v. Ill. Cent. R. Co.*, 128 F. Supp. 311, 324 (N.D. Ala. 1954) *citing Murphy v. North Am. Co., D.C.,* 24 F. Supp. 471, 478 (S.D.N.Y. 1938); Williston on Contracts, secs. 1293A, 677. The difficulty of losing water access and being considered a "new" course was created by Stoneridge because of its inaction in maintaining the course, and considering the circumstances of this case, that difficulty was reasonably foreseeable. Accordingly, the defense of impossibility is not available to Stoneridge.

### d. The doctrine of changed circumstances.

Citing *Gladstone v Gregory*, 596 P. 2d 491 (1979), Stoneridge argues that under the

doctrine of changed circumstances, it is excused from complying with the Agreement.  The doctrine of changed circumstances provides that restrictive covenants will be enforced only as long as the original purpose of the covenants can still be accomplished, and substantial benefit will inure to the restricted area.  *Gladstone*, at 494.  Here, the Regulation applied to the Golf Course, making it impossible to maintain the Golf Course in its present form, because Stoneridge breached its contractual obligations as well as the *Hellerstein* order to maintain the Golf Course.

The restrictions of the Golf Course Agreement continue in full force and effect unless terminated through the affirmative vote of seventy-five percent (75%) of the unit owners.  Any amendment of the restrictions of the Golf Course Agreement requires the affirmative vote of seventy-five percent (75%) of the unit owners.  Under these circumstances, the equitable doctrine of changed circumstances is not available to Stoneridge.

## V.    APPLICATIONS FOR FEES AND COSTS

### 1.    Silverstone's Application for Attorneys' Fees and Costs.

Silverstone submitted its application for attorneys' fees and costs on October 24, 2023, Respondents responded on November 3, 2024, and Silverstone replied on November 10, 2023.  Silverstone claims $553,927.20 in fees and $141,652.59 in costs jointly and severally from Stoneridge and Shun Lee.

### a.    The basis to award fees and costs

The Agreement, Article 13.14 provides that the prevailing party in an arbitration relating to a breach of contract is entitled to its attorneys' fees and costs.  A prevailing party is defined as a party in whose favor a judgment is rendered, regardless of the amount of damages awarded.  *Westgate Planet Hollywood Las Vegas, LLC v. Tutor-Salida Corp.*, 449 P.3d 280 (Nev. 2019).  The Panel found that Silverstone is the prevailing party in this arbitration.  Article 10.3.2 provides in pertinent part that "costs and expenses of the parties hereto may be assessed by the arbitrators and included in any award."

The parties agreed that the applicable rules for these proceedings are the JAMS Comprehensive Arbitration Rules and Procedures, as is set forth in the Preliminary Report.  JAMS Rule 24(f) and (g) authorize the arbitrators to allocate arbitration fees and arbitrator compensation, and attorneys' fees and expenses if provided by the Parties' Agreement.[4]

Accordingly, there is a contractual basis for attorneys' fees and costs in this matter, and the arbitrators have authority to make such an award.

### b.    Whether Silverstone is a prevailing party as to Shun Lee.

---

[4] Similarly, if the AAA Rules applied, as set forth in Agreement Article 10.3, Rule 47(d), provides "the award of the arbitrator(s) may include … an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement."

Silverstone argues Shun Lee is jointly and severally liable with Stoneridge for fees and costs because the Panel found that Shun Lee is bound by the Agreement.  Because the Panel modified its Interim Award to note that Shun Lee is bound by the Agreement *if it forecloses on the Golf Course Property*, and it has not yet done so, Silverstone's argument as to Shun Lee is without merit.  Shun Lee is not yet subject to the Agreement, and therefore there is no contractual basis to award costs and fees against it.

### c.    The reasonableness of Attorneys' Fees.

In Nevada, an award for attorneys' fees is analyzed under *Brunzell v. Golden Gate Nat'l Bank,* 85 Nev. 345 (1969). Under *Brunzell*, when awarding attorneys' fees, the following factors must be considered:

> (1) the qualities of the advocate: his ability, his training, education, experience, professional standing and skill; (2) the character of the work to be done: its difficulty, its intricacy, its importance, time and skill required, the responsibility imposed and the prominence and character of the parties where they affect the important of the litigation; (3) the work actually performed by the lawyer: the skill time and attention given to the work; and (4) the result: whether the attorney was successful and what benefits were derived.

*Brunzell*, 85 Nev. at 349-50.  The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked.  *See Gates v. Deukmejian*, 987 F. 2d 1392, 1397 (9th Cir. 1992).

Stoneridge makes no objection to the hourly rates charged by Silverstone's counsel.  The biographical information of Silverstone's attorney reveals her skill and experience in litigation.  The hourly rates charged are reasonable in Nevada based upon the experience of the Panel.  *See, Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) (it is appropriate for the district court to rely on its own familiarity with the legal market when assessing the reasonableness of hourly rates claimed in fees motions).

### d.    Bankruptcy Proceedings and State Court Litigation.

Stoneridge argues that Silverstone's application for fees for Stoneridge's bankruptcy should be denied because the bankruptcy case is ongoing and there has been no determination that Silverstone is the prevailing party in that action.  Silverstone responds that Stoneridge filed for bankruptcy, which then required Silverstone to seek dismissal of the adversary proceeding and relief from the automatic stay in order to enforce the Agreement.  It therefore argues that fees incurred in the bankruptcy proceeding were in association with the arbitration proceeding.

Here, fees incurred in the ongoing bankruptcy proceedings are outside of the Agreement and are not part of the award.  Accordingly, there is no basis for an award of fees and costs for the bankruptcy proceedings because they are not part of an arbitration relating to a breach of contract.

Stoneridge also argues that Silverstone should not be reimbursed for its decision to bring

13

Stoneridge into the state court litigation, which resulted in an order that the matter must be arbitrated, and for which Stoneridge has been awarded its fees and costs. Because Stoneridge prevailed in the underlying state court action, Silvestone has no basis to claim its fees and costs to resist bringing the matter to arbitration.

Stoneridge provided a cost analysis which was not contested by Silverstone regarding the claimed fees and costs attributable to the bankruptcy and state court litigation. Accordingly, Silverstone's application is reduced by the amount of $81,395.57 in fees and costs sought to be reimbursed by Silverstone's bankruptcy counsel, Fennemore. Additionally, it is reduced by $56,822.00 for amount spent by Gordon Law Firm which relate to the bankruptcy case and the State Court Litigation.

**e.    Garcia expert report.**

Stoneridge argues that the time spent for the retention, preparation of Garcia's expert report, his deposition, and preparing for the arbitration testimony must be disregarded because the Panel deemed him disqualified as an expert. Silverstone responds that Garcia was not disqualified, but rather was found not to be qualified to give legal opinions, and was allowed to testify regarding some of his other opinions.

Although Garcia's testimony and report were significantly limited, he was not prevented from testifying, and portions of his report were considered. For these reasons, costs and fees associated with his testimony are not excluded.

**f.    The propriety of awarding fees on fees.**

Stoneridge argues that courts regularly refuse to authorize the reimbursement of fees for preparing fee applications. Silverstone responds that Stoneridge provides no Nevada case law to support its position, and that it is entitled to its fees to prepare its fee application because they are part of the arbitration. Here, because a claim for fees and costs for the prevailing party is authorized by the Agreement, Silverstone's fees associated with claiming its fees are appropriate.

**g.    The propriety of block billing entries**

Stoneridge argues for a reduction by one-half of Silverstone's fee request because the billing entries are vague and unallocated between different tasks. It argues that the billing entries for their costs do not contain sufficient detail to support an award, and the redacted billings do not specify which claims they relate to, making it impossible to determine whether the redacted claims are attributable to the arbitration.

The Panel has reviewed the billings in detail and finds they are reasonable. The bills are supported by declarations of counsel that attest that the work incurred was in relation to the arbitration. The billings provide adequate information about the types of issues being analyzed, for example, client consultation, motions, discovery, document review, and case management. Many of the tasks are for short times – 15 minutes or less. Discovery was extensive by the parties, requiring multiple depositions and analysis of thousands of pages of discovery. Under

14

the circumstances of this case, and considering the *Brunzell* factors, the Panel finds the billings entries were reasonable.

### f. Summary for Silverstone's Application

All other arguments not discussed are denied. Silverstone's Motion for Attorneys' Fees and costs for $553,927.20 in fees and $141,652.59 is granted in part and denied in part. The Application is reduced by $81,395.57 in fees and costs sought to be reimbursed by Silverstone's bankruptcy counsel, Fennemore, and $56,822.00 for amount spent by Gordon Law Firm which relate to the bankruptcy case and the State Court Litigation, for a total of $557,362.02 due and payable by Stoneridge.

### 2. Stoneridge's application for Attorneys' Fees and Costs.

### a. The basis to award fees

Stoneridge's entitlement to attorneys' fees and costs in Cause of Action Four, Attorney's Fees and Costs, for compelling arbitration, was granted at Summary Judgment.[5] Stoneridge submitted its Application for attorneys' fees and costs on October 24, 2023, Silverstone responded on November 3, 2024, and Stoneridge replied on November 10, 2023. Stoneridge claims the amount of $236,056.18 for attorneys' fees and costs.

### b. The reasonableness of Attorneys' Fees.

As discussed, *Brunzell,* 85 Nev. at 345 provides the basis for analysis. Silverstone first argues that Stoneridge's Application fails because it is not supported by an affidavit as required by Rule 54(d) of the Nevada Rules of Civil Procedure. In its reply, Stoneridge submitted a Declaration sufficient to satisfy this requirement.

Silverstone argues that Stoneridge should not be compensated for its fees and costs in opposing Silverstone's motion for leave to file an amended complaint. Because no arbitration was pending and Silverstone opposed moving the case to arbitration, it was necessary for Stoneridge to oppose the motion to file an amended complaint in order to compel arbitration. Accordingly, Silverstone's objection is overruled.

Silverstone argues that because Desert Lifestyles also filed a motion to compel arbitration, it is unclear how much legal work was performed by counsel for Stoneridge. Because the claim is supported by declarations of counsel that attest that the work incurred was in relation to this matter, it is irrelevant that another party also filed a motion to compel arbitration. Accordingly, Silverstone's objection is overruled.

Silverstone objects to travel and lodging costs for Stoneridge's counsel. The travel was incurred in connection with attendance at hearings in Nevada. Stoneridge argues that because the Nevada court approved the *pro hac vice* admission of Stoneridge's lead counsel, and the hearings were held in person in Las Vegas, the costs are reasonable and necessary expenses.

---

[5] Article 10.3.4 of the Agreement authorized fees and costs for successfully compelling arbitration.

Considering the low amounts claimed, and under the circumstances here, the Panel agrees, and will not exclude travel expenses.

### c.  Hourly rates

Silverstone argues that the hourly rates requested by Mr. Rostamian at $910 per hour and Mr. Tsukerman at $570 are grossly unreasonable.  Mr. Rostamian and Mr. Tsukerman began billing for the case in May, 2018.  Stoneridge provided information that Mr. Rostamian was a partner in his law firm and had been practicing since graduation from law school in 2004, and billed at $865 per hour, and later increased it to $910 per hour.  Mr. Tsukerman was a junior associate who graduated from law school in 2017, and billed for $520 per hour.

The party seeking an award of attorneys' fees bears the burden of establishing the reasonableness of the hourly rates requested are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).  A court may also rely on its own familiarity with the rates in the community to analyze those sought in the pending case. *See, Ingram v. Oroudjian*, 647 F.3d at 928.  A court may consider rates outside the forum "if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 979 (9th Cir. 2008).  Local counsel did provide services in this case.

As a point of comparison to determine appropriate fees, federal courts in Nevada during the same time period as this case was litigated generally held that the market rate for attorneys was between $250 and $400 per hour.  *See Cimini v. White*, 2020 WL 343766, at *2 (D. Nev., Jan 21, 2020)($325 per hour was reasonable for a 10 year attorney and $260 per hour was reasonable for a six year attorney); *LHL Productions, Inc., v. Kabala*, 2019 WL 7403960, at *18 (D. Nev., Dec 31, 2019) (noting that the hourly rate for Las Vegas attorneys is $400 per hour or less); *and see Int'l Inst. of Mgmt. v. Org. for Econ. Cooperation & Dev.,* 2019 WL 5578485, at *6 (D. Nev. Oct. 29, 2019) (collecting cases finding that an hourly rate between $250 and $400 is reasonable for this market).

The Panel finds that the reasonable hourly rate for Mr. Rostamian and other partners is $450 per hour, the same rate as that claimed by Silverstone's counsel, and for Mr. Tsukerman, a junior associate, $350 per hour.

### d.  Summary for Silverstone's Application

All other arguments not discussed are denied.  Stoneridge's Motion for Attorneys' Fees and Costs is granted in part and denied in part.  The Application is reduced to reflect the approved hourly rates in the claims for the five projects set forth in the Motion, to $119,626.  Costs of $5,568.68 are granted.  Fees and costs for Marquis & Aurbach

totaling $5,630 are granted.  Fees and costs for McNutt Law Firm totaling $16,687 are granted.  Taken together, the Panel awards Stoneridge Attorneys' Fees and Costs in the total amount of $147,511.68 due and payable by Silverstone.

16

## VII.    CONCLUSION

Silverstone has established by a preponderance of the evidence that Stoneridge is in breach of its contractual obligations under the Agreement, and conversely, Stoneridge has failed to establish any of its affirmative defenses, and is not excused from the performance of the Agreement.   The Agreement is a valid, binding, and enforceable agreement against Stoneridge, and Shun Lee **if it forecloses on the Golf Course Property**.[6]

Accordingly, the Panel finds that Silverstone is entitled to declaratory judgment that the Golf Course Agreement is a valid, existing, and enforceable contract.  Conversely, Stoneridge's claims for Amendment to Agreement, Removal of the Covenant, Declaratory Relief regarding the Enforceability of the Covenant, Removal of the Covenant, and removal of the Covenant for Impossibility and Force Majeure are denied.  Similarly, all of Shun Lee's claims are denied.

Silverstone's Motion for Attorneys' Fees and costs for $553,927.20 in fees and $141,652.59 is granted in part and denied in part.  The Application is reduced to $557,362.02 due and payable by Stoneridge.

Stoneridge's Motion for Attorneys' Fees and Costs is granted in part and denied in part. The Application is reduced to $147,511.68 due and payable by Silverstone.

This Award resolves all issues which are before the arbitrators.

Dated: December 1, 2023

DocuSigned by:

*Hon. Carl (Bill) Hoffman (Ret.)*

Hon. Bill Hoffman (Ret)
Arbitration Panel Chair

DocuSigned by:

*Philip Pro*

Hon. Philip M. Pro (Ret.)

DocuSigned by:

*Hon. David T. Wall (Ret.)*

Hon. David T. Wall (Ret.)

---

[6] See footnote 3 (modification of the Interim Final Order)..